IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONITA SHARMA, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>BMW OF NORTH AMERICA LLC,<br><br>    Defendant. | Case No. 13-cv-02274-MMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DIRECTIONS TO PARTIES**<br><br>Re: Dkt. Nos. 119, 168 |

Before the Court is defendant BMW of North America LLC's ("BMW") "Motion to Dismiss Plaintiffs' Claims for Lack of Standing and Motion for Summary Judgment," filed January 28, 2016, and, with leave of court, supplemented April 15, 2016. Plaintiffs Monita Sharma ("Sharma") and Eric Anderson ("Anderson") have filed opposition, to which BMW has replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

**BACKGROUND**

In the operative complaint, the Third Amended Complaint ("TAC"), plaintiffs allege they each purchased a vehicle "designed, manufactured, distributed [and] sold" by BMW (see TAC ¶ 1); plaintiffs allege Sharma purchased a "2008 BMW X5" (see TAC ¶ 9) and Anderson purchased an "2007 BMW E60 530I" (see TAC ¶ 19). Plaintiffs further allege that their respective vehicles "were designed so that certain vital electrical components[,] known as SDARS, RDC, and PDC Modules, are located in the lowest part of the vehicles' trunk," where "they are especially prone to water damage that can be caused through the

---

[1] By order filed June 17, 2016, the Court took the matter under submission.

normal and ordinary use of the vehicle." (See TAC ¶ 1; see also TAC ¶¶ 2, 36, 40, 52, 70 (identifying alleged defect as placement of electronic components in "bottom of," or "lowest point" in, trunk).) Plaintiffs allege that they each experienced problems with said electrical components, resulting from water intrusion, and were required to pay for repairs performed by a BMW dealership. (See TAC ¶¶ 13-18, 24-26.) According to plaintiffs, although BMW knew of the asserted defect prior to the dates on which plaintiffs purchased their respective vehicles (see TAC ¶¶ 4, 6), BMW did not advise them of the defect (see TAC ¶¶ 6, 49, 56). Based on the above allegations, plaintiffs allege three claims for relief on their own behalf and on behalf of a nationwide class, specifically, a claim under the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750-1784, a claim under § 17200 of the California Business & Professions Code, and a claim under the Song-Beverly Consumer Warranty Act, §§ 1790-1795.8.

**LEGAL STANDARD**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." See Celotex, 477 U.S. at 324 (internal quotation and citation omitted). "When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "If the [opposing party's] evidence is merely colorable, or is not significantly probative,

summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted). "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." See Matsushita, 475 U.S. at 587 (internal quotation and citation omitted).

## DISCUSSION

BMW argues it is entitled to summary judgment on plaintiffs' claims for the reasons that (1) plaintiffs lack standing to the extent their claims are based on electronic components not located in the lowest part of their respective trunks, and (2) as to claims based on electronic components located in the lowest part of their respective trunks, plaintiffs lack evidence to show that BMW violated the CLRA, § 17200, or breached the implied warranty of merchantability.

Before addressing BMW's arguments, the Court first addresses plaintiffs' request, made in their opposition, that they should be afforded further leave to amend, in this instance to file a Fourth Amended Complaint ("4AC"), "if amendment is needed to make more obvious what is already well known to BMW." (See Pls.' Opp. at 2:3-4.) Although plaintiffs fail to submit a proposed 4AC, the nature of the proposed amendments is apparent from the manner in which the request is made. Specifically, as plaintiffs make such request after plaintiffs, in their opposition, assert that their claims include not only a challenge to the location of the three components specified in the TAC, but also to the location of other components identified in an exhibit to the TAC and in plaintiffs' responses to BMW's discovery requests, it appears plaintiffs seek leave to identify by name those other components. BMW and plaintiffs have, however, fully addressed in their respective submissions whether plaintiffs can establish a claim based on those other components. Under such circumstances, even assuming plaintiffs could demonstrate good cause exists to amend (see Minutes, filed January 27, 2015 (setting March 27, 2015, deadline to amend pleadings)), the Court finds no purpose would be served by delaying the proceedings to afford plaintiffs leave to file a 4AC to identify the components discussed in plaintiffs' opposition brief.

The Court next considers the claims alleged on behalf of each plaintiff, in turn.

**A. Plaintiff Sharma**

**1. Claims Based on Components Identified in Body of Complaint**

As set forth above, the TAC alleges that the placement of three components in the lowest part of the trunk of plaintiffs' vehicles constitutes a design defect. Those three components are identified in the TAC as "SDARS, RDC, and PDC Modules." (See TAC ¶¶ 1, 6, 8, 23.)

BMW offers evidence that the SDARS, RDC, and PDC modules are, if contained in any particular vehicle, located in "different locations, depending on the model/model year" (see Thomas Decl. ¶¶ 8-9), and that said modules are located in Sharma's vehicle, a "2008 BMW X5 (also known as a type of E70)" (see id. ¶ 7), in places other than the lowest part of the trunk of her vehicle. Specifically, BMW offers evidence showing that, in Sharma's vehicle, (1) the SDARS module, i.e., the "Satellite Digital Audio Radio Service" (see id. ¶ 8), is located "above the level of the carpeted floorboard of the trunk, vertically mounted in a bracket perpendicular to the wall of the vehicle's rear driver's-side, behind protective trim" (see id. ¶ 12), (2) the RDC module, i.e., the "Reifen Druck Control" (see id. ¶ 9), is located "in the front passenger compartment of the car, in the dashboard near the steering column" (see id. ¶ 11), and (3) the PDC module, i.e., the "Park Distance Control," is located "on the passenger side in a vertical, perpendicular mount, also above the carpeted floorboard of the trunk and behind protective trim" (see id. ¶ 13). Based on said evidence, BMW argues that, to the extent the SDARS, RDC and/or PDC modules in other vehicles may be located in the lowest part of the trunk, Sharma lacks standing to raise any claim based on such design feature. See Warth v. Seldin, 422 U.S. 490, 499 (1975) (holding plaintiff lacks standing where plaintiff has not "suffered some threatened or actual injury resulting from the putatively illegal action") (internal quotation and citation omitted). In their opposition, plaintiffs offer no evidence to the contrary, nor do they respond to BMW's argument that Sharma lacks standing to raise claims on behalf of class members who do have a SDARS, RDC and/or PDC module in the lowest part of

1  their trunks.

2  Accordingly, to the extent Sharma's claims are based on SDARS, RDC and PDC
3  modules, BMW is entitled to summary judgment.

4  **2.  Claims Based on Components Identified in Exhibit Attached to Complaint**

5  Plaintiffs argue that Sharma's claims are not limited to the three modules identified
6  in the body of the TAC, but that her claims are also based on components identified in a
7  "Service Bulletin" attached to the TAC.  In the "Service Bulletin," BMW identifies six
8  components, other than the SDARS, RDC and PDC modules, that may be damaged by
9  reason of "water ingress," specifically, "MPM (Micro Power Module)," "M-ASK (Multi-
10 Audio System Controller)," "CCC (Car Communication Computer)," "CID (Control
11 Information Display)," "TCU (Telematics Control Unit)," and "LOGIC-7 (Top Hi-Fi)."  (See
12 TAC Ex 1 at 1.)[2]

13 BMW argues that Sharma lacks standing to assert any claim that BMW's
14 placement of the above-referenced six components in the lowest part of a trunk
15 constitutes a design defect.  In support thereof, BMW offers its answer to one of plaintiffs'
16 interrogatories, specifically, its answer stating that, in the E70 X5 model owned by
17 Sharma, the M-ASK, CCC, CID, and TCU components are not located in the lowest part
18 of the trunk, and that the model does not have an MPM or a LOGIC-7 component.  (See
19 Carr Decl. Ex. D at 19-20.)  Plaintiffs offer no evidence to the contrary, and, indeed, offer
20 the same interrogatory response by BMW (see Kershaw Decl. Ex 8), albeit for another
21 purpose.

22 Accordingly, to the extent Sharma's claims are based on MPM, M-ASK, CCC, CID,
23 TCU and/or LOGIC-7 components, BMW is entitled to summary judgment.

---

[2]The Service Bulletin directs persons who service BMW vehicles to "[r]eplace all water-damaged components in the spare tire well and perform applicable electrical repairs to wires and/or connectors" (see id.), to "inspect for water leaks" (see id.) and, where the source of a leak cannot be identified, to, inter alia, "install a warning label" stating that "liquids should not be present on or under the trunk insulation, due to the sensitive nature of the electronic control units located in the spare tire well" (see id. at 3).

### 3. Claims Based on Component Identified in Discovery

Plaintiffs argue that Sharma's claims were also identified in discovery. Specifically, during discovery, Sharma stated, in a response to an interrogatory served by BMW, that she was basing her claims on the HKL module in her trunk. (See id. Ex. 11 at 2-3.)[3] BMW acknowledges that the HKL module is located in the lowest point of the trunk in Sharma's vehicle. (See Thomas Decl. ¶ 29.) Further, it is undisputed that, in January 2013, a BMW dealership determined that the HKL module in Sharma's vehicle had been "destroy[ed]" after water had leaked into the trunk and that said module was "replace[d]." (See Knapp Decl. Ex. D; Sharma Decl. ¶ 14.) Consequently, the Court finds Sharma has standing to challenge the design of the HKL module, and next considers whether BMW is entitled to summary judgment on Sharma's claims based thereon.

### a. First Claim for Relief: CLRA

In the First Claim for Relief, plaintiffs allege that BMW's failure to disclose the asserted design defect constituted a violation of the CLRA. The CLRA prohibits a seller from representing that its products have "characteristics" or "benefits" they do not have, see Cal. Civil Code § 1770(a)(5), or that its products "are of a particular standard, quality, or grade . . . if they are of another," see Cal. Civil Code § 1770(a)(7).

The Ninth Circuit has held that where, as here, a CLRA claim is based on a theory that a seller did not disclose a "design defect," the plaintiff must establish that the defect "caused an unreasonable safety hazard." See Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1141-43 (9th Cir. 2012). In so holding, the Ninth Circuit relied on the California Court of Appeal's decision in Daugherty v. American Honda Motor Co., in which the Court

---

[3] In its interrogatory, BMW requested Sharma "identify all part(s) or component(s) in the subject vehicle that you contend contribute to or comprise the alleged defect, by describing each item in a manner sufficient to allow identification of each such item, including its location in the vehicle." (See id. Ex. 11 at 2:4-7 (emphasis omitted).) The HKL module was the only part or component identified by Sharma. (See id. Ex. 11 at 3:6-8.)

of Appeal found at the pleading stage that a plaintiff failed to state a CLRA claim based on the defendant's not advising the plaintiff that the vehicle she purchased had a design defect in its engine, where the plaintiff did not allege "any instance of physical injury or any safety concerns posed by the defect." See Daugherty v. American Honda Motor Co., 144 Cal. App. 4th 824, 833-836 (2007); see also Wilson, 668 F.3d at 1141. Daugherty, in turn, relied on Bardin v. DaimlerChrysler Corp., in which the Court of Appeal held that the plaintiffs therein had failed to state a CLRA claim based on a theory that the manufacturer failed to disclose a design defect, where "[p]laintiffs did not allege any personal injury or safety concerns related to [the alleged defect]." See Bardin v. DaimlerChrysler Corp., 136 Cal. App. 4th 1255, 1270 (2006); see also Daugherty, 144 Cal. App. 4th at 835-37.

BMW argues that it is entitled to summary judgment with respect to Sharma's CLRA claim based on the HKL module, as any malfunction of said module does not pose a safety concern, given that the module is only "involved in activating the hydraulic lift mechanism for the rear hatch back, so it can be opened remotely rather than manually." (See Thomas Decl. ¶ 29.) The Court agrees that no reasonable juror could find an inability to remotely open the rear hatch back poses an unreasonable safety hazard, and plaintiffs, in opposition, do not contend that it does. Instead, plaintiffs argue they need not show a malfunction of the HKL module creates a safety hazard. In other words, although not expressly asserted, plaintiffs are contending that the Ninth Circuit's understanding of state law, as set forth in Wilson, is incorrect.

In that respect, plaintiffs rely on Rutledge v. Hewlett-Packard Co., 238 Cal. App. 4th 1164 (2015), in which the plaintiffs therein asserted that the defendant, in violation of the CLRA, failed to disclose a defect in "certain notebook computers." See id. at 1168, 1172. In finding the trial court erred in granting summary judgment to the defendant, the Court of Appeal rejected the defendant's argument, which was based on Daugherty and Bardin, that a duty to disclose defects under the CLRA is limited to defects posing an "unreasonable risk of physical injury or other safety concern." See id. at 1173-74.

7

1  Instead, the Rutledge court interpreted Daugherty and Bardin as not "preclud[ing] a duty
2  to disclose material information" unrelated to safety concerns, see id. at 1174, and, in the
3  case before it, found the plaintiffs could base their CLRA claim on their showing that the
4  defect could "obliterate the function of a computer as a computer." See id. at 1174-76.[4]

5  Plaintiffs argue that this Court should follow Rutledge and find a safety concern is
6  unnecessary to establish a CLRA claim based on a failure to disclose a defect. The
7  Court finds plaintiffs' reliance on Rutledge unavailing, for two reasons.

8  First, where, as here, a federal court of appeals has interpreted state law, a district
9  court is bound by the decision, in the absence of a contrary ruling by the highest state
10 court. See Reiser v. Prudential Funding Corp., 380 F.3d 1027, 1029 (7th Cir. 2004)
11 (holding "district court made a fundamental error" in rejecting Court of Appeals decision
12 interpreting state law and following contrary opinion issued by state intermediate court;
13 explaining, "district courts must follow the decisions of [a court of appeals] whether or not
14 they agree," including "decisions interpreting state law"); Johnson v. Barlow, 2007 WL
15 1723617, *3 (E.D. Cal. June 11, 2007) (holding, where Ninth Circuit and California Court
16 of Appeal decisions were in "direct conflict" on issue of state law, district court was
17 "legally bound" to follow Ninth Circuit precedent, "barring a clear holding to the contrary
18 by California's highest court"). As discussed above, the Ninth Circuit has held that, for
19 purposes of a CLRA claim based on the failure to disclose a design defect, the plaintiff
20 must show "the design defect caused an unreasonable safety hazard." See Wilson, 668
21 F.3d at 1143. Moreover, the Ninth Circuit, in a published decision issued five months
22 after Rutledge, adhered to the interpretation of state law it earlier set forth in Wilson. See
23 Daniel v. Ford Motor Co., 806 F.3d 1217, 1225-26 (9th Cir. 2015) (holding, for purposes
24 of CLRA claim, "defects that create safety risks are considered material"; citing Wilson as

---

[4] The defect in Rutledge, if manifested, caused the display screen not to function, and plaintiffs therein argued that "a functioning display screen is critical to a notebook computer's function, because without it, the computer would not be portable and would require the connection of an outside monitor." See id. at 1175.

"holding in the duty-to-disclose context that an omission must pose safety concerns to be material").

Second, assuming, arguendo, the Court were not bound by the Ninth Circuit's interpretation of the CLRA, BMW has shown, under the standard set forth in Rutledge, that it did not have a duty to disclose that the HKL module may become inoperative if water leaks into the trunk. Unlike the situation in Rutledge, in which the defect, if manifested, would render the product at issue non-functional, see Rutledge, 238 Cal. App. 4th at 1175 (holding seller of computers has duty to disclose defects concerning computer parts that are "central and necessary to the function of the computer as a computer"), the failure of an electronic component that allows the rear hatch to be opened remotely does not render the vehicle, or even the rear hatch, non-functional. Plaintiffs' reliance on Sharma's declaration, in which she states she must "avoid carrying liquid cargo in the cargo department" in order to avoid liquids leaking into trunk and then having to incur "extremely expensive repairs" (see Sharma Decl. ¶ 17), is, as a matter of law, insufficient to create a triable issue of fact. Under California law, a manufacturer has "no duty to disclose" a defect where the "risk posed by the alleged defect [is] the cost to repair the product." See Wilson, 668 F.3d at 1141 (interpreting California law); Daugherty, 144 Cal. App. 4th at 836 (holding plaintiff cannot base CLRA claim on allegation that failure to disclose defect exposed plaintiff to "'serious potential damages' - namely, the costs of repairs in the event the defect ever [manifested]").

Accordingly, to the extent the First Claim for Relief is based on Sharma's claim that BMW did not disclose the allegedly defective design of the HKL module in Sharma's vehicle, BMW is entitled to summary judgment.

### b. Second Claim for Relief: § 17200

In the Second Claim for Relief, plaintiffs allege that BMW's failure to disclose the asserted design defect, identified by plaintiffs in the above-referenced discovery response as the placement of the HKL module in the lowest part of the trunk (see Kershaw Decl. Ex. 11 at 3), constituted a violation of § 17200. As pleaded, the Second

Claim for Relief is derivative of the First Claim for Relief, by which plaintiffs allege a violation of the CLRA (see TAC ¶¶ 100-05), and, in their opposition, plaintiffs do not contend the Second Claim for Relief is based on other conduct. For the reasons stated above, BMW has shown that, to the extent such claim is alleged on behalf of Sharma, BMW is entitled to summary judgment on the First Claim for Relief.

Accordingly, to the extent the Second Claim for Relief is based on Sharma's claim that BMW did not disclose the allegedly defective design of the HKL module in Sharma's vehicle, BMW likewise is entitled to summary judgment.

### c. Third Claim for Relief: Song-Beverly Act

In the Third Claim for Relief, plaintiffs allege BMW violated the Song-Beverly Act. Under the Act, "every sale of consumer goods that are sold at retail in [California] shall be accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable," see Cal. Civ. Code § 1792, which warranty means, inter alia, that the goods are "fit for the ordinary purposes for which such goods are used," see Cal. Civ. Code § 1791.1(a); see also Isip v. Mercedes-Benz USA, LLC, 155 Cal. App. 4th 19, 26 (2007) (holding "core test of merchantability is fitness for the ordinary purpose for which [the] goods are used") (internal quotation and citation omitted).

With respect to automobiles, the Ninth Circuit has interpreted California state law to require a plaintiff asserting a claim for breach of the implied warranty of merchantability to establish that a defect "compromise[d] the vehicle's safety," "render[ed] it inoperable," "drastically undermined the ordinary operation of the vehicle" or "drastically reduce[d] its mileage range." See Troup v. Toyota Motor Corp., 545 Fed. Appx. 668, 669 (9th Cir. 2013) (citing cases); see, e.g., Brand v. Hyundai Motor America, 226 Cal. App. 4th 1538, 1547-48 (2014) (finding plaintiff stated cognizable claim for breach of implied warranty of merchantability based on allegation defendant sold plaintiff vehicle with "substantial safety hazard").

//
//

10

In the TAC, plaintiffs allege that the "defect . . . cause[d] [Sharma's] [v]ehicle[ ] to malfunction and become inoperable, making [her] [v]ehicle[ ] unsafe and unfit for [its] ordinary purpose." (See TAC ¶ 116.) BMW argues that plaintiffs lack evidence to support such allegation or to otherwise show Sharma's vehicle was not fit for its ordinary purpose. BMW relies on evidence, undisputed by plaintiffs, that "a malfunction of the HKL module . . . could not have caused [Sharma's] vehicle to 'shut down' or cause her engine to lose power while driving," for the reason that "the Communication Area Network ('CAN') 'bus' to which the HKL module is connected" is "physically separated by a 'gateway' module from the 'power train' components of the vehicle (i.e., the engine)." (See Thomas Decl. ¶ 30.) Although BMW does not dispute that, during the period of time in which Sharma's HKL module was inoperable, Sharma could not open the rear hatch back remotely, the Court finds such inability does not rise to the level of a breach of the implied warranty of merchantability, as no reasonable trier of fact could conclude that having to open the rear hatch manually during the limited period of time in which the HKL module was inoperable compromised the vehicle's safety, caused the vehicle to become inoperable, drastically undermined the ordinary operation of the vehicle, or affected the vehicle's mileage.

Accordingly, to the extent the Third Claim for Relief is based on the malfunction of the HKL module in Sharma's vehicle, BMW is entitled to summary judgment.

**B. Plaintiff Anderson**

**1. Claims Based on Components Identified in Body of Complaint**

As noted, the TAC alleges that the placement of the SDARS, RDC and PDC modules in the lowest part of the trunk of plaintiffs' vehicles constitutes a design defect.

**a. SDARS and PDC Modules**

Anderson owns a "2007 BMW E60 530i" (see Anderson Decl. ¶ 2), which is "a type of E60" (see Thomas Decl. ¶ 7). BMW offers evidence to establish that Anderson's vehicle does not have a SDARS or a PDC module (see id. ¶ 10), and plaintiffs offer no evidence to the contrary. Consequently, the Court finds Anderson lacks standing to raise

11

claims on behalf of class members who do have a SDARS and/or PDC module in the lowest part of their trunks.  See Warth, 422 U.S. at 499.

Accordingly, to the extent Anderson's claims are based on the SDARS and PDC modules, BMW is entitled to summary judgment.

### b. RDC Module

BMW does not dispute that Anderson has standing to challenge the design of the RDC module.  Indeed, the parties agree that the lowest point in the 2007 BMW 530i is the spare tire well (see Thomas Decl. ¶ 10; Knapp Decl. Ex. A at 164:8-11), and BMW acknowledges that at the time Anderson purchased his vehicle, the RDC module was located in the spare tire well (see Thomas Decl. ¶¶ 9, 10).  Further, it is undisputed that, in March 2012, the RDC module in Anderson's vehicle "was damaged by water intrusion and replaced." (See Thomas Decl. ¶ 17; see also Anderson Decl. ¶ 9.)[5]

#### 1. First Claim for Relief:  CLRA

The RDC module is the vehicle's "tire pressure monitor." (See TAC Ex. 1 at 1.) In the Owner's Manual, BMW describes the monitoring function as follows:  "As an added safety feature, your vehicle has been equipped with a tire pressure monitoring system, TPMS, that illuminates a low tire pressure telltale when one or more of your tires are significantly under-inflated." (See Kershaw Decl. Ex. 9 at 95.) The TAC does not expressly allege the type of safety hazard that could occur if the RDC module malfunctions.  Nevertheless, as the purpose of the RDC module is to advise the driver that a tire has become under-inflated, it appears, and plaintiffs in their opposition confirm, their theory is that driving on an under-inflated tire is unsafe, and that a driver would be

---

[5]According to Anderson, on a date in March 2012, after he parked his vehicle, "it began to rain, and water . . . wept into the [s]ubject [v]ehicle's trunk." (See Kershaw Decl. Ex. 12 2:18-21 (Anderson's Responses to BMW's First Set of Interrogatories); Anderson Decl. ¶ 7.)  When Anderson attempted to start the vehicle, it "failed to start and [his] dashboard flashed a number of warning messages." (See Anderson Decl. ¶ 7.)  The dealership at which the vehicle was serviced advised Anderson that "[w]ater ingress damaged the RDC control unit" (see Kershaw Decl. Ex. 12 at 26-28), after which the RDC module was relocated to a higher point in the vehicle (see TAC ¶¶ 19, 22-25; Thomas Decl. ¶ 10).

12

1 unaware of such under-inflated condition if the RDC module malfunctioned. (See Pls.'
2 Opp. at 19:9-13) (arguing under-inflated tires are responsible for numerous accidents
3 each year and drivers rarely check tire pressure).)

4 In seeking summary judgment, BMW argues plaintiffs lack evidence to establish
5 that an unreasonable safety hazard would exist if the RDC module in the 2007 BMW 530i
6 were to malfunction due to water intrusion in the spare tire well. For purposes of the
7 instant motion, BWM does not argue that plaintiffs lack evidence to support a finding that
8 the placement of the RDC module in the spare tire well constitutes a design defect, and,
9 in its moving papers, does not contend that driving on under-inflated tires would not pose
10 an unreasonable safety hazard.[6] Rather, BMW argues that, even where a plaintiff can
11 establish both a design defect and an unreasonable safety hazard, such plaintiff cannot
12 establish a CLRA claim in the absence of a "causal connection between the alleged
13 design defect and the alleged safety hazard." See Wilson, 668 F.3d at 1143-45
14 (affirming dismissal of CLRA claim, where, although plaintiffs sufficiently pleaded both
15 "design defect" and "safety hazard," plaintiff failed to allege how defect, if manifested,
16 would "cause[ ]" asserted safety hazard to occur).

17 In support of its motion, BMW relies on evidence showing that, if the RDC module
18 ceases to function, the "driver gets a display warning" (see Knapp Decl. Ex. E at 63:12-
19 15), specifically, a "yellow light on the instrument cluster" (see Thomas Decl. ¶ 17; see
20 also id. Ex. B at 185:16-20). In their opposition, plaintiffs do not dispute that the 2007
21 BMW 530i has a component that alerts the driver if the RDC module becomes unable to

---

[6] BMW does argue that Anderson "has never been in an accident or experienced a safety issue with his vehicle." (See Def.'s Mot. at 14:1-2.) BMW cites no authority, however, and the Court has located none, requiring a plaintiff to experience a safety hazard as a prerequisite to establishing a CLRA claim. Indeed, the Ninth Circuit has held that a plaintiff may base a CLRA claim on a "potential" that an alleged defect in a vehicle could "lead[ ]" to "an unreasonable safety risk." See Daniel, 806 F.3d at 1221, 1226 (holding plaintiffs established triable issue as to CLRA claim based on failure to disclose defect in vehicle's rear suspension that "leads to premature tire wear," where "reasonable fact finder could infer that a vehicle that experiences premature and more frequent tire wear would pose an unreasonable safety risk," such as "potential blowouts").

13

monitor tire pressure.[7]  Indeed, plaintiffs offer evidence that it does.  (See Kershaw Decl. Ex. 10 at 83:15-17 (BMW employee's deposition testimony that if RDC module stops working, such event "triggers a warning to the driver alerting the driver the system is not functioning").)  Additionally, plaintiffs offer the Owner's Manual, in which BMW states that when the vehicle "may not be able to detect or signal low tire pressure as intended," a "TMPS malfunction indicator" will illuminate; the indicator is further described therein as follows:  "When the system detects a malfunction, the telltale will flash for approximately one minute and then remain continuously illuminated."  (See id. Ex. 9.)  The Owner's Manual also cautions, "In the case of a malfunction, have the system checked."  (See id.)

In sum, it is undisputed that the 2007 BMW 530i is designed so that either (1) the RDC module will advise the driver when a tire is under-inflated, or (2) the driver will be advised by another component that the RDC module has malfunctioned and cannot monitor the tire pressure electronically.  Plaintiffs argue that the existence of the malfunction indicator, however, does not compel a finding that no unreasonable safety hazard exists if the RDC were to malfunction due to water intrusion.

In support of their argument, plaintiffs rely on 49 C.F.R. § 571.138, a federal regulation promulgated by the National Highway Traffic Safety Administration ("NHTSA"), mandating that vehicles have a tire pressure monitoring system, such as the system in the 2007 BMW 530i.  See 49 C.F.R. § 571.138 (setting forth "performance standards for tire pressure monitoring systems (TPMSs) to warn drivers of significant under-inflation of tires and the resulting safety problems").  Additionally, in 2002, when the NHTSA promulgated the initial version of § 571.138, it published a "Final Rule," cited by plaintiffs, in which the NHTSA found that "[m]any vehicles have significantly under-inflated tires, primarily because drivers infrequently check their vehicles' tire pressure."  See Federal

---

[7]Neither BMW nor plaintiffs provide the name of the component that alerts the driver when the RDC module is not able to monitor tire pressure.  BMW does, however, offer evidence, undisputed by plaintiffs, that such component is not located in the lowest part of Anderson's trunk.  (See id. ¶ 10.)

1  Motor Vehicle Safety Standards, 67 Fed. Reg. 387704-01, 38712-13 (2002).  At that time,

2  the NHTSA also identified a number of "consequences of under-inflation of tires,"

3  specifically, that "[an under-inflated tire's] sidewalls flex more and the air temperature

4  inside the tire increases, increasing stress and the risk of failure," and that such tire

5  "loses lateral traction, making handling more difficult" and "can increase a vehicle's

6  stopping distance."  See id. at 38713-14.  Further, the NHSTA found, "[u]nder-inflation

7  also plays a role in crashes due to flat tires and blowouts."  See id. at 38707, 38714

8  (noting its earlier finding that, based on university study, "under-inflated tires were

9  probably responsible for 260,000 crashes each year").

10  In light of the NHTSA's findings, a trier of fact could reasonably conclude that

11  driving on significantly under-inflated tires could cause an unreasonable safety hazard,

12  given the dangers of driving on such tires, coupled with the common practice of drivers

13  not checking tire pressure on a regular basis.  See, e.g., Public Citizen, Inc. v. National

14  Highway Traffic Safety Admin., 489 F.3d 1279, 1283 (D.C. Cir. 2007) (finding, based on

15  NHTSA Final Rule, "many American drivers do not regularly check the tire pressure on

16  their cars," which "can cause problems for the drivers and their passenger — and for

17  others on the road — because driving a car with severely under-inflated tires increases

18  the risk of serious accidents").

19  As discussed above, if, as a result of water intrusion into a spare tire well, the RDC

20  module malfunctions, the driver of a 2007 BMW 530i is notified that the vehicle is unable

21  to monitor tire pressure.  At that point, however, such a driver is essentially in the same

22  position as a driver of a vehicle without a tire pressure monitoring system, i.e., the driver

23  would not know whether or not he/she is driving on a significantly under-inflated tire

24  unless the driver were to check the tire pressure, an action that, as the NHTSA has

25  noted, many drivers do not take.[8]  Consequently, the Court cannot conclude on the

---

[8]Although the driver of a 2007 BMW 530i would be aware of the need to have the vehicle serviced to fix the RDC module, there is no evidence in the record indicating how quickly such a driver ordinarily would do so.

15

record before it that a trier of fact would be obligated to find a lack of causal connection between the alleged design defect and the safety hazards posed by driving on significantly under-inflated tires. See Daniel, 806 F.3d at 1226 (holding determination of whether design defect "would pose an unreasonable safety risk" is issue of fact).

In its reply, BMW, in an effort to avoid such a ruling, relies on a statement by the NHTSA that it "does not believe that a significantly under-inflated tire represents an imminent safety hazard." See Federal Motor Vehicle Safety Standards, 67 Fed. Reg. at 38732 (emphasis added). The NHTSA made such statement in the context of deciding whether the "warning telltale" should be yellow or red, the latter color being "reserved for telltales warning of an imminent safety hazard." See id. (relying on testing results indicating that from time tire becomes under-inflated to extent telltale is activated, tire "[would] be able to operate safely for at least 90 minutes"). BMW cites no authority, however, and the Court has located none, suggesting that, for purposes of California law, the term "unreasonable safety hazard," see Wilson, 668 F.3d at 1143, encompasses only safety hazards that are "imminent" in nature, i.e., "about to occur at any moment," see Websters' II New College Dictionary 553 (1995). In the absence of any such authority, the Court finds an unreasonable safety hazard exists as long as there is a sufficient causal connection between the uncorrected condition and the ability to safely operate a vehicle.

Finally, BMW argues plaintiffs lack evidence to establish that BMW had knowledge of the alleged design defect. See Wilson, 668 F.3d at 1145 (holding plaintiff must show "[seller's] knowledge of a defect to succeed on [a CLRA claim]"). Although BMW acknowledges that its Service Bulletin, attached as an exhibit to the TAC, indicates "electronic modules in the spare tire well could get damaged if a sufficient amount of water enters the trunk" (see Def.'s Mot. at 19:10-12), it argues the Service Bulletin cannot support plaintiffs' claims because the document "makes no mention of a defect, let alone a safety concern" (see id. at 19:13). A reasonable trier of fact could infer, however, that BMW, as a manufacturer of motor vehicles, had knowledge of the above-discussed

16

findings by the NHTSA, specifically, that significantly under-inflated tires pose safety hazards. Indeed, before adopting its Final Rule, the NHTSA gave notice of the proposed rule, see Federal Motor Vehicle Safety Standards, 67 Fed. Reg. at 38708, and requested and received comments from, inter alia, "vehicle . . . manufacturers," see id. at 38709. Further, the Service Bulletin states that the RDC module, if located in the "spare tire well," is subject to "various electrical problems or faults" due to "water collect[ing] in the spare wheel recess" (see TAC Ex. 1 at 1), and BMW's Rule 30(b)(6) designee, when asked if it "[w]ould be safe to continue driving [a] vehicle without ever getting [the tire monitoring system] fixed," answered, "No. . . . . because there is a potential if it's not functioning it would not warn [the driver] of a potential issue" (see Kershaw Decl. ¶ 11, Ex. 10 at 85:4-10).

Accordingly, to the extent the First Claim for Relief is based on Anderson's claim that BMW did not disclose a defect in the design of the RDC module in his vehicle, BMW has not shown it is entitled to summary judgment.[9]

### 2. Second Claim for Relief: § 17200

In the Second Claim for Relief, plaintiffs allege that BMW's failure to disclose the asserted design defect in the RDC module constituted a violation of § 17200. As discussed above, said Claim for Relief is derivative of the First Claim for Relief. (See TAC ¶¶ 100-05.) For the reasons set forth above, BMW has not shown it is entitled to summary judgment on the First Claim for Relief to the extent said claim is alleged on behalf of Anderson and is based on the RDC module.

Accordingly, to the extent the Second Claim for Relief is based on Anderson's claim that BMW did not disclose a defect in the design of the RDC module in Anderson's vehicle, BMW likewise has not shown it is entitled to summary judgment.

---

[9]In so finding, the Court has not relied on the opinions offered by plaintiff's expert William B. Guentzler. Accordingly, the Court hereby DENIES as moot BMW's motion to strike said expert's declaration pursuant to Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993).

### 3. Third Claim for Relief: Song-Beverly Act

As set forth above, a plaintiff asserting a claim under the Song-Beverly Act based on a theory of breach of the implied warranty of merchantability must establish that a defect in a vehicle "compromise[d] the vehicle's safety," "render[ed] it inoperable," "drastically undermined the ordinary operation of the vehicle" or "drastically reduce[d] its mileage range." See Troup, 545 Fed. Appx. at 669. For the reasons set forth above, BMW has not shown plaintiffs lack evidence to support a finding that the alleged defect, specifically, the placement of the RDC module in the spare tire well, compromised the safety of Anderson's vehicle.

Accordingly, to the extent the Third Claim for Relief is based on the malfunction of the RDC module in Anderson's vehicle, BMW has not shown it is entitled to summary judgment.

### 2. Claims Based on Components Identified in Exhibit Attached to Complaint

BMW argues that Anderson lacks standing to assert a claim that BMW's placement of the MPM, M-ASK, CCC, CID, TCU, and LOGIC-7 components in the lowest part of a trunk constitutes a design defect. In support thereof, BMW offers its answer to one of plaintiffs' interrogatories, specifically, its answer stating that Anderson's vehicle did not have an MPM or a LOGIC7 component, and that the M-ASK, CCC, CID and TCU components are not located in the lowest part of the trunk. (See Carr Decl. Ex. D at 19-20.) Plaintiffs offer no evidence to the contrary, and, indeed, offer the same interrogatory response by BMW (see Kershaw Decl. Ex 8), albeit for another purpose.

Accordingly, to the extent Anderson's claims are based on MPM, M-ASK, CCC, CID, TCU and/or LOGIC-7 components, BMW is entitled to summary judgment.

### 3. Claims Based on Components Identified in Discovery

During discovery, BMW served upon Anderson an interrogatory asking him to "identify all part(s) or component(s) in the subject vehicle that you contend contribute to or comprise the alleged defect, by describing each item in a manner sufficient to allow identification of each such item, including its location in the vehicle." (See id. Ex. 11 at

1  2:4-7 (emphasis omitted).)   In response, Anderson stated that the "defect" on which he
2  bases his claims is BMW's placement of "certain electronic components," specifically the
3  RDC module and "IBS," in "the lowest point of the vehicle trunk compartment."  (See id.
4  Ex. 12 at 2-3).  The IBS is the "Intelligent Battery Sensor," which component "monitors
5  the condition and charge of the battery."  (See Thomas Decl. at 6:25-27.)

6  As discussed above, it is undisputed that the lowest point of the trunk in
7  Anderson's vehicle is the spare tire well.  BMW offers evidence that "the only electronic
8  module" that has ever been in Anderson's spare tire well" is the RDC module.  (See id.
9  ¶ 18.)  Plaintiffs offer no evidence to the contrary, and, in particular, offer no evidence
10 that the IBS sensor is or was ever located in Anderson's spare tire well.  As it is
11 undisputed that the IBS sensor in Anderson's vehicle is not located in the lowest point of
12 his trunk, the Court finds Anderson lacks standing to raise claims on behalf of class
13 members who do have an IBS sensor in the lowest point of their trunks.

14 Accordingly, to the extent Anderson's claims are based on the IBS sensor, BMW is
15 entitled to summary judgment.

## CONCLUSION

17 For the reasons stated above, BMW's motion for summary judgment is hereby
18 GRANTED in part and DENIED in part, as follows:

19 1.  To the extent BMW seeks summary judgment on the claims asserted on behalf
20 of plaintiff Sharma, the motion is hereby GRANTED.

21 2.  To the extent BMW seeks summary judgment on the claims asserted on behalf
22 of plaintiff Anderson, the motion is hereby GRANTED as to all claims other than those
23 based on the RDC module, and to the extent the claims asserted on behalf of Anderson
24 are based on the RDC module, the motion is hereby DENIED.

25 Additionally, the previously-set deadline for plaintiffs to file a motion for class
26 certification having been stayed (see Order, filed January 29, 2016), the parties are
27 hereby DIRECTED to file, no later than fourteen days from the date of this order, either
28 (a) a stipulation setting forth a proposed briefing schedule and hearing date on plaintiffs'

motion for class certification, or (b) if the parties are unable to so stipulate, a joint statement setting forth their respective proposed schedules.

**IT IS SO ORDERED.**

Dated: August 18, 2016

MAXINE M. CHESNEY
United States District Judge